## THE STATE *v.* ALEXANDER BRETTE.

In criminal cases, where the accused applies for a continuance upon the ground of the absence of material witnesses, accompanied by an affidavit of the facts he expects to prove by the absent witnesses, he cannot be forced to trial upon the prosecuting attorney offering to admit, that if the witnesses were present, they would swear to the facts as stated, reserving the right of disproving their testimony. The admission must be of the truth of the facts stated in the affidavit, or the accused will be entitled to a continuance. The rules of practice laid down in the Code of Practice, govern in civil cases, but do not apply to criminal cases.

Where a juror, in a criminal case, when examined on his *voir dire*, states that " from the rumors he has heard of the case, his mind is biased and prejudiced; but that the bias and prejudice may be removed after he has heard the evidence in the case, and that his mind is open to conviction, and thinks he can do justice between the parties;" his answer does not constitute a good ground for challenge. It is only when the juror called has formed so decided an opinion of the case, that he believes himself, or the court believes, it would influence his verdict, that he should be rejected.

The verdict of a jury is the record of their deliberate judgment. Jurors cannot be examined to impeach their own verdict or the record by parol proof.

Where, on an indictment for murder, the accused was entitled to a continuance upon an affidavit showing the absence of material witnesses, and containing a statement of the facts which the absent witnesses would prove, which evidence would have alleviated the crime to manslaughter, but was forced to trial upon the prosecuting attorney admitting that absent witnesses would swear as stated in the affidavit, and the jury have convicted the accused of manslaughter only, a new trial will not be awarded to him; full effect having been given to the testimony of his absent witnesses.

The court will not, upon an appeal, re-examine the decision of a district judge upon a question of fact, such as, whether due diligence had been used to procure the attendance of a witness.

APPEAL from the District Court of St. Mary. *Voorhies*, J. *P. D. Hardy*, District Attorney, for the State. *T. H. Lewis* and *P. Soulé* for defendant. The judgment of the court was pronounced by

PRESTON, J. The prisoner is indicted for the murder of *Jules Rabourdin*, in the parish of St. Mary, on the 5th day of March, 1850. An indictment was found against him on the 4th of June, he was arraigned and plead not guilty on the 5th, and was put upon his trial on the 10th of that month, without having applied for a continuance. On the 14th of the month the jury were discharged, having declared that they could not possibly agree upon a verdict.

At the term of the court for the parish, in January, 1851, the accused was again put upon his trial. He made an application to the court to continue the cause, based upon the following affidavit: " Personally appeared before me, the undersigned authority, *Alexander Brette*, of the parish of St. Mary, defendant in the above entitled cause, who, being duly sworn, deposeth and saith, that he cannot safely go to the trial of this suit at the present term of this honorable court, because of the absence of the following witnesses, to wit, *Henry L. Bornet, Francis Budd* and *Pierre Viaud*, each and every of which witnesses is material and important for the defence of this deponent in this prosecution. He further saith, that said *Bornet* was duly recognized by the committing magistrate in the month of March last, to appear and testify on the trial of this suit, and that he is now absent without the procurement or knowledge of deponent; and deponent verily believes he will be enabled to procure the attendance of said *Bornet* at the next term of this court. He further saith, that the said *Francis Budd* was duly summoned in the month of June last, to appear and testify on the trial of this suit, and that he is now absent without the consent or procurement of deponent; and deponent verily believes he will be enabled to procure the attendance of said *Budd* at the next term of this court. Deponent further saith, that on the 1st day of the present term of this court, he caused a summons to be duly issued to the aforesaid *Pierre Viaud*, commanding him to appear instanter, and give his testimony on the trial of this cause; and that said summons was then mailed to the sheriff of the parish of St. Martin, where said witness resides, with directions to said sheriff to serve the same on said witness without delay, and to make due return thereof. And he further saith, that said summons has not yet been returned. And deponent further saith, that he expects to prove,

by said *Bornet*, all the facts as testified to by him on the examination of this case before the committing magistrate; and further, the following facts, to wit, that the deceased, *Jules Rabourdin*, on the 5th of March last, came to the coffee house of *Paul Prevost,* with the express purpose of cowhiding deponent; that the deceased had been, for four weeks previous to said 5th of March, hunting deponent for the purpose of cowhiding him; that on the 27th of February last, said *Bornet*, having heard of the violent threats of said deceased against deponent, went to the residence of the late *Adrien de Vivilie*, where a public sale was being held, and where said *Bornet* knew deponent would be present, and where he supposed the said deceased would also be present, and that said *Bornet* so went there, under the apprehension that said deceased would attack deponent with deadly weapons, and for the purpose of preventing said deceased from carrying his threats against deponent into effect. And deponent also expects to prove, by said witness, other facts material to his defence, which he is not now able to disclose. Deponent will prove, by said *Francis Budd*, that five weeks previous to said 5th of March, the said deceased used the most insulting and opprobious language concerning deponent, because deponent was engaged in the defence of a suit brought by the wife of the deceased, and avowed his intention to cowhide deponent the first time he should meet him; and deponent expects also to prove, by him, all other facts as proved by him on the former trial of this cause. By the testimony of said *Viaud*, deponent expects to prove that several weeks prior to said 5th of March, deceased publicly used the most abusive and insulting language concerning deponent, because of deponent's connection with the aforesaid suit brought by the wife of deceased, and threatened to cowhide deponent at first sight, and that, if deponent should resist, he would kill him. That deponent has used his utmost endeavors to procure the attendance of the three above named witnesses at the present term of this court, but has been unable to do so. And deponent further says, that *Jean Dryris* is also a material and important witness for deponent, to enable him to make out his defence to this prosecution. That said *Dryris* was duly recognized in the month of March last by the committing magistrate, to appear and give evidence on the trial of this case; that he is now absent without the consent or procurement of deponent, and that deponent has used his best endeavors to procure his attendance at this term of the court without effect. That deponent, on the 16th day of the present month, caused a writ of attachment to issue from this honorable court against the said *Dryris*, on which attachment the sheriff has returned that said witness cannot be found, and deponent cannot safely go to the trial of this suit without the testimony of said *Dryris*; and that deponent verily believes he will be able to procure the attendance of said *Dryris* at the next term of this court. And deponent expects to prove by the testimony of said witness, the following facts, to wit, that on the 5th day of March last, the deceased, *Jules Rabourdin*, came to the coffee-house of *Paul Prevost* for the express purpose of cowhiding deponent; that on said day, he entered said coffee-house with his whip in hand, walked hastily on deponent without stopping at any place, and when within three or four feet from deponent, raised his whip to strike deponent, and that he was in the act of striking deponent when he was shot. And deponent further says, that *Achilles Briard* is also a material witness for deponent in the defence of this prosecution, without whose testimony deponent cannot safely go to trial; that said witness was duly summoned to appear and testify on the trial of this case at the last term of this honorable court, but that he is now absent without

the consent or procurement of deponent; and deponent verily believes he will be enabled to procure his attendance at the next term of this court. Deponent has used his best efforts to procure the attendance of said witness at the present term of this court, but in vain. And deponent will prove by the testimony of said *Briard*, that on the day previous to said 5th of March last, the deceased, *Jules Rabourdin*, being present at a public sale at *Mistress Prevost's*, made inquiries for deponent for the purpose of attacking deponent, and threatening personal violence against deponent could he meet him, and, at the same time, struck his hand upon his pocket, where there appeared to be some weapon, saying, in an excited manner, that he was ready for deponent. And deponent saith, that this affidavit for continuance is not made for delay, but for the sole purpose of enabling him to have the evidence of the above named witnesses at his trial, and to secure him impartial justice."

The application for a continuance was rejected by the court, and the defendant took the following bill of exceptions: " Be it known, that on the 23d day of January, 1851, in the present term of this honorable court, *Alexander Brette*, the defendant in the above entitled suit, moved this court for a continuance of this suit, on the strength of his affidavit hereto annexed, marked A, and made a part of this bill of exceptions, which motion was overruled by the presiding judge, upon the grounds of the prosecuting attorney's admitting that the witnesses, *Henry L. Bornet, Francis Budd* and *Achilles Briard*, in said affidavit named, would, if present, testify to the facts as disclosed in said affidavit, reserving to the said prosecuting attorney the right to contradict said witnesses and to controvert the facts thus admitted; and also, upon the grounds that defendant was obliged to disclose in his affidavit for a continuance, all the facts he expected to prove by his absent witnesses, notwithstanding this is the first application for a continuance, this being the second trial of the case, there having been a mistrial at a previous term; and also, upon the ground that said affidavit did not show due diligence to procure the attendance of *Pierre Viaud*, one of the witnesses in said affidavit named, and that the prosecuting attorney was not bound to admit the facts expected to be proved by said *Viaud*, as set forth in said affidavit, nor that, if present, he would testify to them. To which ruling of the said court the defendant, by his counsel, excepted on the following grounds, to wit, 1st. That the defendant has a right to have said suit continued to enable him to secure the personal attendance of his witnesses. 2d. That if forced to the trial without the personal attendance of his witnesses, it should be upon the prosecuting attorneys' admitting the absolute truth of the facts set forth in said affidavit as expected to be proved by said absent witnesses, and not merely that said witnesses would, if present, testify to said facts. 3d. That defendant has a right to have this suit continued upon his affidavit, without disclosing the facts he expects to prove by his absent witnesses, as this is his first application for a continuance. 4th. That this suit should be continued to obtain the testimony of *Pierre Viaud*, a witness named in said affidavit, due diligence being shown in said affidavit to procure his attendance at this term of the court, or else that the district attorney should be required to admit that said witness, if present, would testify to the facts as disclosed in said affidavit."

The accused being indicted and on trial for murder, the testimony of his absent witnesses was indispensable to alleviate the charge into the crime of manslaughter, and was therefore most material on the trial. No question is raised by the bill of exceptions as to the diligence of the accused to procure the attendance of the

STATE<br>*v.*<br>BRETTE.

witnesses, *Briard, Bornet* and *Budd*, nor as to the truth of his affidavit that he expected to procure their attendance at the next term of the court. Could he then be forced to trial by the admission of the district attorney, that the witnesses would swear to the facts stated, and not absolutely that those facts were true, but, on the contrary, reserving the right to contradict the witnesses and to controvert the facts thus admitted?

It is conceded that, under these circumstances, a continuance in a civil case would not have been granted; because the 466th article of the Code of Practice, as amended by the 9th section of the act of 1839, expressly forbids it. But those laws are limited to the regulation of practice in civil cases, and do not purport to change the principles which governed criminal proceedings. Now, by' the act of 1805, it is expressly provided, "that the method of trial, the rules of evidence, and all other proceedings whatsoever, in the prosecution of crimes, shall be, except as otherwise provided, according to the common law."

The practice as to the subjects under consideration was, at common law, substantially the same in civil and criminal cases. Now, in the case of *Larrat* v. *Carlier*, "the defendant prayed a continuance on an affidavit, stating a certain fact which he expected to prove by the absent witness." The counsel of the plaintiff said, "I will admit at the trial the fact *to have been sworn to by the witness.*" The counsel of the defendant replied, "if the plaintiff will admit *the existence of the fact*, we have no objection to proceed to trial; but if the fact is only admitted as sworn to, and witnesses are to be introduced to contradict it, by the detail of circumstances, from which it is expected to draw an inference that the fact cannot have existed, and cannot have been sworn to without perjury, we will want the absent witness in order that, by giving his testimony with the same particularity, he may show that he is entitled to belief." The distinguished judge to whom the application for the continuance was made, sustained these views. He said, "the defendant has taken every legal means in his power to procure the attendance of his witnesses. He may therefore demand a continuance *ex debito justitiæ*. I am unable to recollect any case in which the court has ever gone so far, in Great Britain or the United States, except in Massachusetts, in which, by a rule of the Supreme Court, the party praying a continuance cannot have it, if his opponent offer what is now proposed to the defendant," and granted the continuance.

In the case of the *People* v. *Vermillia*, 7 Cowen, 369, it was held in New York, that it is not sufficient that the opposite party should admit that the absent witness would testify to the specific facts; there must be an admission that those facts are absolutely true. And it is laid down as a general rule in Cowen and Hill's notes upon Phillips, vol. 2, p. 49, that where the defendant states particulars, it is not enough to deprive him of a continuance that the plaintiff admits the facts, if such admission be not full and unqualified; but that a full admission of the facts would be a good cause against the continuance. There are conflicting opinions, but in the conflict we feel safe in adhering to that of our late very able chief justice, and conclude, therefore, that the district court, on this trial for murder, should have granted the continuance prayed for on the affidavit filed.

The answer of *Jesse Matthews*, a juror on his *voir dire*, when called to be sworn, was not a sufficient ground for his challenge. He answered, "that from the rumors he has heard of the case, his mind is biased and prejudiced, but that that bias and prejudice can be removed after he has heard the evidence in the case, and that his mind is open to conviction, and thinks he can do justice between the parties."

It was held, in the case of the *State* v. *Williams*, 3 Stewart's R. 454, that "in a capital case, it is not a ground for a peremptory challenge to a juror that he has formed upon common report, and expressed an opinion of the guilt of the prisoner, if the juror believed that such opinion would have no influence upon him in the formation of his verdict, should the evidence on the trial be different from the report of the facts." In the case of the *State* v. *Queensberry*, 3 Stewart and Porter's Rep., 308, the decision was to the same effect. The same principle has often been decided in Virginia. *Commonwealth* v. *Armstead; Same* v. *Brown; Same* v. *Ossander;* Leigh's Rep.

It is only when the juror called has formed so decided an opinion on the case, that he believes himself, or the court believes, it would influence his verdict, that he should be rejected. The prejudice and bias in the present case was produced, not by ill-will nor by evidence, but by rumors. The juror, himself, and the court did not doubt but that it would be dispelled by his oath, his duty, and the evidence to be heard. When a homicide is committed, and the perpetrator is known, rumor will almost necessarily circulate reports to his prejudice, and bias men against him. It must affect all men very much alike, until the defence is ascertained by evidence. But all can remove that prejudice and bias when truth and evidence is opposed to rumor, and they are sworn and empanelled in the jury-box, to do justice to a fellow man according to that evidence.

A majority of the court are of opinion, that they have no power to inquire whether the discretion of the court, in refusing a new trial on the ground of misconduct of the jury, was properly exercised. *State* v. *Hunt*, 4th Ann. 438; also, 4th Ann. 504; 3 Wheeler's Crim. Law, 309. A careful examination of the testimoney has brought me to the same conclusion with the district judge, that there was no material misconduct on their part; that there is no sufficient evidence that they separated from each other, farther than necessity required, after the case was committed to them; and that there is no evidence of the exercise of improper influences upon their minds against the prisoner. Even if the threats of *Barlow* were real, there is not the least reason to believe that *Wimer* was influenced by them. So *Bauvilin*, being a lawful juror, had every means to know and understand the case which the law affords, and a new trial could not be granted, on account of his failure to do so, if that was the fact.

It is settled as law, that jurors should not be examined to impeach their verdict. And a high regard for that tribunal in criminal cases, requires the rigid enforcement of the rule. We adhere to the decision of this court, in the case of the *State* v. *Caldwell*, 3 Ann., 435. The verdict is the record of their deliberate judgment. They cannot be permitted to impeach the record by parol. 8 R. R., 433.

The separation of the jury, in *Hornsby's* case, was admitted; also, in *Dismond's* case; and the reluctance with which we adhered, in the latter case, to the decision in *Hornsby's* case is a sufficient reason for requiring indisputable evidence of a separation which would produce effect, before affording relief on this ground.

Still, the case before us presents a new and most difficult question. The prisoner was indicted and tried for the crime of murder. The jury found him guilty only of manslaughter. The homicide was therefore, beyond a doubt, perpetrated by the defendant. The testimony which he sought for, from his absent witnesses, by no means tended to cause a doubt upon the fact that he committed a homicide, but should, if believed, have alleviated it from murder into manslaughter. Now, the jury have found the prisoner only guilty of man-

STATE
*v.*
BRETTE.

slaughter. They, therefore, believe the statements as to the testimomy which could have been obtained from the absent witnesses. They have given it its full effect, and the accused has enjoyed the full benefit of it. The judge, on a full and unqualified admission of the facts stated, could not have instructed the jury that they had any other legal effect than that which the jury has given to them. It is possible, if they had been fully admitted, the jury, being the judges of the law as well as of the facts, might have acquitted the prisoner entirely; but then, they would have given to the facts an effect to which they were not entitled in law. And when the facts bring a case even within a technical manslaughter, the jury should not hesitate to convict, for when human life is destroyed, the letter of the law should be vindicated. Our legislature were so sensible of this, that they have left the greatest discretion, as to that offence, with the courts. For, according to the circumstances of alleviation or aggravation, the judge may inflict a day or twenty years imprisonment, and a fine of one dollar or two thousand dollars.

If the jury had found the prisoner guilty of murder, we would undoubtedly have set aside the verdict and reversed the judgment, because of the error in ruling the accused to trial without the presence of material witnesses. But can we set aside a verdict and reverse a judgment, which was the necessary and legal effect of the evidence admitted, even if unimpeached, the fact of the homicide being established? We think not. The case has often occurred, of great errors committed in the hurry, the toil, the trouble, and real difficulties of a jury trial. But if they do not affect the great result, if substantial justice has been done, and the whole object of the law has triumphed, the Supreme Court would abuse, and not aid the inferior courts, and justice itself, by seizing upon those errors, not to correct them, but without any reasonable motive or legal advantage to the public or individuals, to annul the proceedings of the inferior tribunals.

If the testimony which the accused expected to obtain from the absent witness, *Viaud*, stood upon the same footing with that of the other two witnesses, the case would be still more difficult; for the statement is, that " the deceased threatened to cowhide the accused at first sight, and that if he resisted, he would kill him." The district court, however, was of opinion that the affidavit did not show due diligence to procure the attendance of the witness, *Viaud*, and it has become the settled jurisprudence of this court, that, on appeals, we cannot revise decisions involving questions of fact. See the case of the *State* v. *Hunt*, 4th Ann., 439, and the cases there cited.

The judgment of the district court is therefore affirmed, with costs.

---

## SAME CASE—On a RE-HEARING.

In giving a prisoner the benefit of all questions of law erroneously decided against him in the courts of the first instance, care is necessary, in order not to incroach upon the discretionary powers which the judges of the district courts hold, and must exercise, in the delicate and responsible cases of applications for continuance and new trials, over which the Supreme Court has no supervision, except in determining the questions of law, alone submitted by bill of exceptions, or on an assignment of error.

Where a party, on a trial for murder, has been convicted of manslaughter only, in the event of a new trial being granted, he cannot be again tried for murder; but will be tried, as if the prosecution had been originally for manslaughter.

The accused, on his trial for murder, was convicted of manslaughter. He asked for a new trial, upon the ground, that he was forced to trial in the absence of witnesses, who would

have proved certain facts.  *Held :* That as the facts stated, if proved, would not have formed a good defence to the charge of manslaughter, he was not entitled to a new trial.

THE judgment of the court, on a re-hearing, was pronounced by

EUSTIS, C. J.  From the manner in which this case has been prepared in the court below and presented, in argument, to the consideration of this court, I am apprehensive that some misconception exists, as to the extent of its powers, in the revision of criminal causes, and of the mode in which those powers are exercised.  These subjects have been very fully discussed by the most eminent counsel at New Orleans.  In the case of the *State* v. *Flint,* 2d Ann. 838, it was held, that the Constitution confers appellate jurisdiction on this court, in questions of law alone ; and in that of the *State* v. *Bogan,* Ib, 839, that the accused is not entitled, on the appeal, to a statement of facts, as a means to enable the court to review questions of law, which he desires to present; and the court refused a *mandamus* to that effect.  In the case of the *State* v. *Peterson,* Ib. 923, it was held, that the court could not examine the evidence, for the purpose of determining whether the court below properly exercised its discretion in refusing the accused a new trial ; the question being one of fact, in relation to which we are not permitted to inquire or to determine.  In the case of the *State* v. *Nelson,* 3d Ann. 500, the want of power in the court to examine questions of fact, was again asserted.  In the case of the *State* v. *Hunt,* the subject of the powers was elaborately argued, and thoroughly reconsidered.  *Hunt,* the appellant, was convicted of larceny, and sentenced to the penitentiary.  He applied for a new trial on his affidavit, that he had, since the trial, discovered two witnesses, by whose testimony he could establish an *alibi.*  The district judge refused the application, and the accused appealed.  The court delivered the following opinion :

" THE STATE *v.* HUNT.—*Oliver Hunt* was convicted of larceny in the First District Court of New Orleans, and was sentenced, for his offence, to two years imprisonment at hard labor in the penitentiary.  He applied for a new trial, on his affidavit that he had, since the trial, discovered two witnesses, by whose testimony he could establish an *alibi.*  The district judge overruled the application for a new trial, and *Hunt* has appealed from the judgment awarding the sentence.

" We do not propose to examine the sufficiency of the affidavit ; but to consider the question, whether this court, under the constitution, can review the decision of the district judge, in refusing the application for a new trial.  The jurisdiction of this court in criminal cases extends to questions of law alone, whenever the punishment of death or hard labor may be inflicted, or when a fine exceeding three hundred dollars is actually imposed.  By the 33d section of the act of May 4th, 1805, for the punishment of crimes and misdemeanors, the rules of evidence and all other proceedings in criminal cases, except as otherwise provided, were to be according to the common law, changing what ought to be changed ; and since that period, all our criminal statutes have been enacted and construed with reference to that system.  It is therefore a safe guide, in construing the article of the constitution vesting the court with its limited criminal jurisdiction.  Under the common law, judgments can be reversed by writ of error, which lie from all inferior criminal jurisdictions to the court of Queen's Bench, and from the Queen's Bench to the House of Lords.  A writ of error does not lie to the House of Lords for an error of fact ; but, for an error of this description, a writ of error *coram nobis,* as it is there called, lies in the same court.  This is the case in some of the States

of the Union, where the courts, from their organization, can issue a *venire* for the trial of the error of fact. See case of *Arnold et al* v. *Duncan*, 14 Johnson's Rep. 417.

"It seems to us to be clear, that the constitution, in limiting the jurisdiction of this court, in criminal cases, to questions of law alone, by its terms excluded all cognizance of questions of fact. The Supreme Court of the United States, in construing its common law jurisdiction, under the constitution, and the judiciary act of 1789—a jurisdiction by no means restricted as much as ours—has determined, by a series of decisions, what points are open for examination under a writ of error; and those decisions have all been made in conformity with what were understood to be the rules and principles of the common law. By the 22d section of the judiciary act, it is provided that on a writ of error to the Supreme Court, there shall be no reversal for error in fact. That court has always held, that error does not lie on the refusal of the court below to grant a new trial. Although that court takes no cognizance of criminal cases, except in a division of opinion of the judges of the court below, the decisions in civil cases appear to us conclusive of the principle. *Henderson* v. *Moore*, 5 Cranch, 11. *Barr* v. *Gratz*, 4 Wheaton, 213, *Blunt's lessee* v. *Smith et al*. 7 Wheaton, 248. *Brown* v. *Clark*, 4 Howard, 4.

"In the case of *Barr* v. *Gratz*, Judge Story remarked that the proposition was too plain for argument.

"Nor does error lie, on the refusal of the court below to continue a cause after it is at issue. *Marine Insurance Co.* v. *Hodgson*, 6 Cranch, 218. In that case, Mr. Justice Livingston says, it may be very hard not to grant a new trial, or not to continue a cause; but in neither case can a party be relieved by a writ of error. *Wood* v. *Young*, 4 Cranch, 237. 5 Cranch, 280. 7 Cranch, 152. 7 Cranch, 565, etc.

"If this court cannot examine a question of fact in criminal cases, it cannot review the acts of a judge of the first instance resting in his discretion. In the present case, the judge did not believe the affidavit of the prisoner, that he could prove an *alibi*. He sat on the trial of the cause, he heard the witnesses, and had an opportunity of forming an opinion of the whole affair, with its attendant circumstances; and, we think, the constitution has provided wisely in leaving these matters in the discretion of the magistrate, who has the best means of thoroughly understanding them. If the facts attempted to be proved by the affidavit of the prisoner, were to be confessed in court by the attorney general, a different case would be presented; and cases have occurred, in which courts have acted upon the confession of the attorney general, on writs of error of errors in fact. *Rex* v. *Wilkes*, 4 Burrows, 2550.

"In this case nothing is conceded; and a question of fact, which we are not permitted to determine, is an insuperable obstacle to the exercise of our jurisdiction, which is confined to questions of law alone.

There is nothing in the statute of 1846, which provides for the mode of bringing criminal cases before this court, which affects the question under consideration. It depends upon the constitution alone.

"Previous to the adoption of the present constitution, the late Court of Errors and Appeals, in the case of the *State* v. *Charlotte*, 8 Robinson, 529, held, that, under the statute creating this court, it was empowered to grant relief against decisions of inferior tribunals, in criminal cases, on questions confided to their legal discretion. The ground on which that decision was based, was, that the various decisions of the Supreme Court of the United States on that subject,

were inapplicable to that court, because, under the statute creating it, the court was not a court of errors only. The insertion of the word "alone," in the constitution, confines the jurisdiction of this court exclusively to questions of law; and on the reasoning of the Court of Appeals, the decisions of the Supreme Court of the United States would be applicable to the question of jurisdiction of this court." 4th Ann. 438, 439.

Up to this period, the place on the bench now held by Mr. Justice Preston, was filled by the late Judge King, an excellent criminal lawyer, and of great experience. The court was unanimous in its conclusions on this subject, from its organization in 1845. On the accession of Mr. Justice Preston to the bench, as the successor of Judge King, the subject was again reargued and fully reconsidered. After a long deliberation, the doctrine in the case of the *State* v. *Hunt*, was affirmed; Mr. Justice Preston dissenting. Vide the *State* v. ———, 6th Ann. I think, after what has passed, that decision, on the powers of this court, ought to be considered as settling the questions therein decided.

My opinion is, that on the trial for murder, the district judge was wrong in ruling the prisoner to trial, on the ground stated in the bill of exceptions, and, in so doing, committed an error of law. And my impression, when the opinion of the court was prepared, was, that if the jury had found the accused guilty of murder, it would have been our duty to have set aside the verdict, on account of this error of law. This impression I still retain, although there are difficulties in giving the accused the benefit of this question, which embarrasses its application in the administration of criminal justice, under the powers of this court and the courts of the first instance. In giving a prisoner the benefit of all questions of law erroneously decided against him in the courts of the first instance, the case is, necessary in order, not to encroach upon the discretionary powers which the judges of the district court hold, and must exercise, in the delicate and responsible cases of applications for continuances and new trials, over which this court has no supervision, except in determining the questions of law alone, submitted to them by bill of exception, or on an assignment of error.

The extreme legal effect of the evidence, of which the accused was deprived by the ruling of the judge, would have been to reduce the case from the crime of murder to that of manslaughter. The verdict for manslaughter is an acquittal of the crime of murder. The accused never can again be put on his trial for murder: if a new trial be awarded, he can only be tried for manslaughter. The legal aspect of the case, at present, is the same, as if the prosecution had been originally for manslaughter. The judge of the first instance, in considering the subject of the right of the accused to have the benefit of this evidence, on an application for a new trial, would have been bound to refuse it, according to the rules of law. If this evidence had been offered, on another trial for manslaughter, the court would have been bound to direct the jury to consider it as affording no justification or defence whatever to the offence, for which the accused was then on his trial. The change in the state of the case, by the result of the trial, presents an unusual condition with reference to the evidence, which would have been so material on the original trial; but I can come to no other conclusion, than that of the opinion delivered by the court, that we are not authorized, on the principles of law, to disturb the verdict.' I conceive, that according to the principles established, in the cases cited, in *Hunt's* case, of courts of the highest authority; and, in that case, the duties of this court are plain and beyond all reasonable doubt.

STATE
*v.*
BRETTE.

There are some cases, which I have found, which seem to recognize the principle upon which our conclusion on the subject is founded; they are not similar to the present case, but are, in affirmance of a principle, strongly analogous to that upon which it is decided.

If the court refuse to give an opinion, when required, upon a point relative to the issue, and the jury should, notwithstanding, find a verdict in accordance with the opinion requested, there is no error of which the party can complain. *Douglass et al* v. *McAlister.* 3 Cranch, 298.

If the judge states the law, and states it erroneously, his opinion ought to be revised, and if it can have any influence on the jury, the verdict ought to be set aside. *Etting* v. *The Bank of the U. States.* 11 Wheaton, 59. Vide 11 Wheaton, 199.

Our decision, in relation to the competency of *Matthews*, the power was ,made on a thorough consideration of the subject, and we can discover no sufficient reasons for changing our conclusions.

The point made concerning the alleged misconduct and separation of the jury, we consider as within the cases decided by this court, and affording no authority to this court to set aside the verdict. The *State* v. *Hunt*, and other cases cited. The petition for a re-hearing is therefore refused.

PRESTON, J. The time limited for our sessions in the country, and the great amount of important litigation, renders it impossible to give to the cases that long and considerate examination which we could wish, and they deserve; we acknowledge, with much satisfaction, the great aid we receive from counsel by their well prepared briefs, their able arguments and the liberal use of their libraries. Yet, new questions arise sometimes, which we cannot investigate and decide with that confidence in the correctness of our decisions, which we enjoy when surrounded with more extensive libraries, a greater number of practitioners, and the necessary leisure.

This important case affords a striking example. It presented several questions of frequent occurrence, which were argued at the bar with uncommon ability. But after examining these, another, and to us at least, entirely new question arose, which had not been argued at all, and which we yet thought was fatal to the appeal. Under these circumstances, we thought it best to present our views on the whole case, after less than a day's examination, in order to afford ample time for a reëxamination of the case, on an application for a re-hearing, with the aid of counsel, on this new point.

The counsel of the accused having applied for a re-hearing, and expressed his dissent from the whole opinion in the strongest terms, I have re-examined that part of it, which, I think, presents a new question, and have come to my former conclusion. But I will frankly confess, with that diffidence which results from the examination of a new and difficult question, in a limited time, without authorities in relation to it, nor ample means of coming to a correct conclusion.

We have fully expressed our opinion, that a continuance should have been granted to the prisoner, on his trial for murder, and given the reasons. On that trial, an error of law had been committed; it was our duty to point out that error, that it might not occur again in the necessary hurry of a jury trial. Having done so, the question necessarily arose, as to the effect of that error on the cause in its present situation. In civil cases, it is well settled, that error of law in the progress of a trial, shall not affect the judgment, unless we can clearly see that it has produced substantial injustice. There is no reason why the same rule should not be followed in criminal cases.

Shall the verdict for manslaughter, on a trial for murder, be annulled, and the judgment of the court be reversed? That cannot be done without legal grounds, adequate motives and the imperative commands of justice. The accused was, by the verdict, substantially acquitted of murder, and his life cannot be put in jeopardy again for the same offence. The trial has removed even the suspicion that he committed a deliberate and malicious homicide.

If we remand the cause, it is that the accused may be put on trial for manslaughter. Events subsequent to the application for a continuance, having rendered the testimony which he sought to obtain unnecessary, as to the crime of murder of which he is not now in reality charged, it must be viewed as testimony sought to defend him against the existing charge of manslaughter. And if the cause is remanded, it must be for the sole purpose that he may have the benefit of that testimony, on his trial for manslaughter.

The testimony implies, that he committed a homicide, and is desired for the sole purpose of showing, that it was an excusable homicide in self-defence. It is therefore necessary, to know precisely what was the testimony sought, in order to judge whether the cause should be remanded to obtain it.

And before adverting to the testimony expected from the absent witnesses, it is necessary to observe, that the district court, in the exercise of its discretion, had a right to require the disclosure of all the facts to be proved by the absent witnesses, in order to judge whether they were material to the defence, or not, and whether there was a legal necessity to continue the cause, in order to obtain them. Wharton, C. L., 597.

A trial for murder could rarely be had where there was great danger of conviction, if to be continued on the general affidavit of the prisoner, that the absent testimony was material; for, in his opinion in his own cause, every thing would be material on such an awful occasion. We cannot doubt, therefore, the prudent exercise of his discretion, by the judge, in imposing terms, that the testimony should be disclosed, on this trial, which was taking place nearly eleven months after the homicide.

It is further to be observed, that it does not clearly appear whether the statement of the facts to be proved was required by the judge, in order to decide upon the application, or was tendered by the prisoner. The affidavit was drawn and sworn to several days before the trial, and it does not appear that he tendered a general affidavit, or that the court required a particular statement. Whether tendered or required, it should have been a statement of all the facts upon which the accused relied for a continuance; and we cannot examine any others than those before us.

The prisoner stated in his affidavit, that he could prove by *Bornet*, "all the facts as testified to by him on the examination of this case, before the committing magistrates." Now, he has not brought that deposition before us, nor made it a part of his bill of exceptions. It is impossible, therefore, for us to say, that it entirely excused the accused. On the contrary, notwithstanding that affidavit, the committing magistrates committed him to prison, and he was not even bailed until after the first trial, more than three months subsequent to the examination. For the same reason, we cannot consider the "other facts (as expressed in the affidavit,) material to his defence, which he expected to prove by him, but which he is not now able to disclose." Nor can we consider the testimony expected to be obtained from the absent witness, *Viaud*, for the reasons given in the opinion already delivered.

STATE
*v.*
BRETTE.

Now, read the detail of facts to be obtained from the testimony of *Bornet* attentively. They are : 1. That the deceased came, on the 5th of March, to the coffee-house where his death occurred, for the purpose of cowhiding the defendant.  2. That for four weeks before, he had hunted him for that purpose.  3. That the witness, on the 27th of February, having heard of the violent threats of the deceased against the accused,. sought for him, in order to restrain him, under the apprehension that he would attack the accused with deadly weapons, and to prevent him from carrying his threats against the accused into effect.

The testimony to be obtained from *Budd,* is far from being as strong.

The testimony to be obtained from *Briard* is, that the day before the homicide, the deceased inquired for the accused, for the purpose of attacking him ; that he threatened personal violence, and struck his hand upon his pocket where there appeared to be some weapon, saying in an excited manner, he was ready for the accused.  This is the whole substance of the testimony of the absent witnesses.

Now, if the deceased came to the coffee-house to cowhide the accused, he came to commit an assault and battery.  This does not excuse homicide.  Even if he attempted it with a whip, not a deadly weapon, the homicide which prevented it, would have been manslaughter.  Though, like the homicide of him found in the act of seducing a wife or daughter, it would have been manslaughter of the lowest grade; and as, in such a case, in England the hand would have been touched lightly with the brand, and would not have been afterwards unworthy of the grasp of honest men, so, in a case of homicide committed in a sudden conflict, to prevent the degradation of being whipped with a cowskin, a temporary and not very disgraceful punishment in the penitentiary would be inflicted.  A homicide committed in a sudden affray, under such circumstances, falls within the very definition of manslaughter.  Why then every thing necessary to alleviate homicide, from murder, into manslaughter !  For, it is laid down as one of the rules of manslaughter, ''that any assault made with violence, or circumstances of indignity upon a man's person, if it be resented immediately by the death of the aggressor, and it appear that the party acted, in the heat of blood, upon that provocation, will reduce the crime to manslaughter.'' Wharton Criminal Law, 236.

Even Chief Justice Parker, in his charge on *Selfridge's* trial, which has been the subject of much consideration, stated to the jury ''his doubt, whether self-defence could in any case, be set up, where the killing happened in consequence of an assault only, unless the assault be made with a weapon, which, if used at all, would probably produce death,''

So, threats the day before, of a kind not disclosed to us, or for four weeks before, or even the possibility that a hostile individual carried a concealed weapon, does not entirely excuse homicide.  Opinions to that effect, cannot be found in any elementary book or judicial decision of high authority.  In the case of *Selfridge,* always quoted on these occasions, the court undoubtedly laid down correctly the principles of law abstractly considered.  But the verdict of the jury, upon facts somewhat similar to those disclosed by the affidavit we are considering, was erroneous, and is a lasting memento of the weakness of juries, sometimes in favor of persons upon trial, and has caused a deplorable recklessness of human life.  Let this prosecution, now for manslaughter, be tested by a special defence, on account of the facts stated in this affidavit.  Indicted for manslaughter, would it be sufficient for the accused to plead that the deceased

threatened me four weeks, or four hours before the catastrophe; or that he    STATE
hunted to cowhide me; or came to a coffee-house to do it; or was suspected    *v.*
of carrying a concealed weapon, to be ready for me? All this would alleviate    BRETTE.
the homicide into manslaughter; but could not entirely excuse it.

It is said, these facts connected with others, might induce the jury to excuse the accused. Still, as judges, we are bound to pronounce, that the excuse must result from the other facts, and not from these which can have no such legal effect. And we cannot remand the cause, that when proved, they may have an illegal effect.

What, then, is necessary entirely to excuse homicide on the ground of self-defence? The answer is, what the terms purport, that the homicide is absolutely necessary to the defence. If our person can be protected by any other means than the awful resort to homicide, it will not be excused. In general, a known felony must be attempted upon our person. 1. East Pleas, C. 271. The danger must be actual and imminent. Wharton, C. C. 497. The accused must show, that he killed his adversary through mere necessity, to avoid immediate death, or at least insupportable outrage. 1 Russel, 779. In cases of personal conflict, in order to maintain the defence, it must appear, that the party killing had retreated, at least as far as the fierceness of the assault would permit him. 1 Hale, 481, 483. In a word, it must be proved, that the assault was eminently perilous, and could not be avoided or resisted, except by slaying the assailant. In all these cases, and all others of self-defence, the excuse of the party killing, must result from facts which occur at the very time of the conflict.

Great previous provocation will not even justify an assault and battery. Antecedent threats would be a good ground for binding over the party to keep the peace. Approaching an antagonist with a cowhide, is to be redressed by the laws, unless such an assault be made, as does not appear in this affidavit. They do not show the great ingredient in the plea of self-defence, an inexorable necessity to kill. Now, it must be forever borne in mind, that the question is not whether the evidence should have been obtained on a trial for murder or, even whether it should be admitted, on a trial for manslaughter; but, whether a verdict and judgment having been rendered for manslaughter, substantial justice requires that both should be reversed, in order to remand the cause to receive this testimony, to reduce the homicide to that which is excusable in self-defence. The more I reflect upon the testimony, the more I feel that it cannot have that legal effect, and cannot, therefore, consent to annul and reverse a solemn verdict and judgment, to remand the cause, in order to give this evidence an effect to which it is not entitled in law.

ROST, J. I adopt the conclusion of my brethren, for the reasons given by the chief justice.